FILED
NOV 06 2008

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, | CIV. 07-4047 |
| Plaintiff, | MEMORANDUM OPINION AND ORDER |
| -vs- | |
| AIR WISCONSIN AIRLINES CORPORATION, d/b/a United Express, | |
| Defendant. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending is Air Wisconsin Airlines Corporation's (Air Wisconsin's) Motion for Summary Judgment (Doc. 78). Air Wisconsin asserts the conduct in question was "childish and unprofessional behavior among a group of employees" which fails to "rise to the level of unlawful, gender-based harassment." (Doc. 83, p. 1). The Equal Employment Opportunity Commission (EEOC) resists the summary judgment motion asserting Caroline Lescroart was "subject to repeated harassment over a nearly five year period by three male employees who believed that "you have to keep women in their place, and harassed her because they wanted her to quit." (Doc. 88, p. 1). Both sides agree "[t]he critical issue is whether . . . members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Oncale v Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

## JURISDICTION

Jurisdiction is invoked pursuant to 28 U.S.C. §§ 451, 1331, 1337, 1343, and 1345. Federal questions are raised under 42 U.S.C. §§ 2000e-5(f)(1) and (3) and 42 U.S.C. § 1981a. The parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).

## PLEADINGS

1. **Complaint.**

The EEOC sued Air Wisconsin under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et. seq. The EEOC seeks "to correct an unlawful employment practice on the basis of sex-based harassment, and to provide appropriate relief to Caroline Lescroart." (Doc. 1). They claim that Air Wisconsin allowed Lescroart's co-workers to create a discriminatory hostile working environment based on Lescroart's gender and that Air Wisconsin failed to take action to prevent and end the conduct. For relief the EEOC requests (1) a permanent injunction enjoining Air Wisconsin from engaging in gender based harassment or retaliation; (2) an Order directing Air Wisconsin to carry out policies, practices, and programs to eradicate unlawful employment practices; (3) compensatory damages for Lescroart for non-pecuniary injuries including loss of reputation, emotional distress, suffering, inconvenience, loss of enjoyment of life, and humiliation; (4) punitive damages[1] and (5) costs.

2. **Answer.**

After acknowledging jurisdiction Air Wisconsin denies all of the EEOC's claims except those expressly admitted. Air Wisconsin asserts the following sixteen affirmative defenses: (1) failure to state a claim on which relief can be granted; (2) that claims not previously raised and therefore not investigated by the appropriate agency are barred; (3) statutes of limitation; (4) that Lescroart's failure to engage in the conciliation process in good faith bars the action and remedies; (5) Lescroart's failure to take advantage of preventative or corrective opportunities bars the claim;

---

[1] It is apparent this is not the first time the EEOC has used this language in a complaint inasmuch as the prayer for relief states "Order Wyeth. . . ." Wyeth is not a party to this litigation.

2

(6) the claim is barred because Air Wisconsin exercised reasonable care to prevent and correct any sexually harassing behavior; (7) the alleged acts occurred outside the scope of Lescroart's employment; (8) Lescroart is estopped from recovering from Air Wisconsin by her own conduct; (9) Lescroart's unclean hands or waiver bar the EEOC's claim; (10) laches; (11) Air Wisconsin has not acted with actual malice or wanton or willful disregard, barring the punitive damage claim; (12) the compensatory and punitive damage claims are capped by statutory limits; (13) mitigation of damages; (14) failure to state a claim for punitive damages; (15) the claim is barred by the doctrine of after acquired evidence; and (16) Air Wisconsin reserves the right to assert further affirmative defenses as they become evident.

## UNDISPUTED FACTS

Caroline Lescroart began working for Air Wisconsin as a passenger service agent (PSA) in Colorado in April of 1998. A PSA is responsible for working the airline ticket counters, handling passengers at the loading gate, and loading and unloading luggage on the airport ramp. A PSA is also responsible for customer service from the time the passenger arrives at the airport to the time the passenger's flight leaves the airport. Lescroart transferred to Air Wisconsin's Sioux Falls, South Dakota station on May 17, 2001. Lescroart was awarded the lead agent position at the Sioux Falls station because she was the most senior agent. PSAs at Air Wisconsin are represented by the International Association of Machinists and Aerospace Workers ("Union"). Under the collective bargaining agreement, some Air Wisconsin stations such as the Sioux Falls station had a lead agent position. A lead agent is selected by seniority and interest in the position. Lead agents earn a higher hourly salary than other PSAs and are usually given additional responsibilities at the station.

Chris Turner was another PSA at the Sioux Falls station who had been working for Air Wisconsin since November 1, 1999. Turner disliked Lescroart because she transferred into the station and assumed his number one spot on the seniority list. Turner and Lescroart appeared to be vying for power at the Sioux Falls station.

Lenn Island was another PSA at the Sioux Falls station who was employed with Air Wisconsin from the Spring 2002, until February 2005. Lescroart admits that she called Island the "F___g New Guy" ("FNG") at work. On June 21, 2005, after Island was discharged, he filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and Sioux Falls Human Relations Commission against Air Wisconsin, alleging that Lescroart harassed him and created a hostile work environment. Lescroart used the words "shit, f___, damn" and "FNG" with her co-workers. Lescroart admits cursing at her co-workers, and that her cursing "was inappropriate for the workplace."

Island yelled and cursed at Lescroart in June of 2004 after Lescroart asked him to load carry-on baggage. Lescroart cannot recall the curse word used. Island passed gas next to her on August 27, 2004, while they were outside on the tarmac. The same day Island (1) showed Lescroart the food in his mouth; (2) picked his nose and showed her his dried nasal mucus; (3) commented "that you have to keep women in their place, you to build them up a little and then bring them down;" (4) called Lescroart the cleaning lady because she was cleaning around him; (5) called out the word sooey and made weird noises at Lescroart when she backed up the jet bridge; and (6) belched in Lescroart's face. On September 3, 2004, Island told Lescroart that she eats too much and that "he is tired of hearing about you being on a diet and then getting into the snack bin." Island told her that she ate like a wolf. Turner and Island would sometimes block her path so that she would have to walk around them.

4

In April of 2002, Turner called her a "bitch," "f___g bitch" and a "fat ass." Barry Holmstrom cursed at her in front of a SkyWest airline crew on one occasion. Island and Turner filed frivolous complaints about her. Turner, Island and Holmstrom referred to her as one of the "blond bitches." Dyke, a female, cursed at Lescroart and was verbally abusive to her on several occasions, and Lescroart was humiliated by her "abuse." Lescroart admits almost all of her co-workers, including the females, cursed and acted inappropriately at work. On April 17, 2002, Lescroart received a performance review by her female supervisor, Ingie Richter, indicating among other things, that she had difficulty working with others. Several female employees believed that Lescroart was very bossy, arrogant, provocative and not easy to work with. Lescroart admits to having problems working with Kandis Moore (female), Chris Turner (male), Lenn Island (male), Jennifer Dyke (female), and Barry Holmstrom (male).

In 2003 Turner filed two complaints with Air Wisconsin against Lescroart complaining that he just wanted Lescroart to leave him alone so he could do his job. (Doc. 82, #5, ex. 1(c)[2] & 82, #6, ex 1(d)).

In 2004 Island filed two complaints with Air Wisconsin against Lescroart, one complaining about hostile work environment not gender related and one complaining that she posted his first complaint for all employees to see (Doc. 82, #7, ex. 1(e) & 82, #8, ex 1(f)). His first complaint against Lescroart, Operations Manager, and Tom Pierce, Station Manager, related to Island's work assignments. In his complaint he asserts that hiring Lescroart "as our new Operations Manager was a huge mistake! Her operational style (micromanagement) breeds hostility and makes working in

---

[2]Doc. 82, #5 is exhibit 1(c). If the reader has directed the CMECF software program to show the headers, the header for the same document, ex. 1(c), will show as "Document 82-6". It's a quirk in the software program. This same quirk repeats itself for all the Appendix Exhibits identified in Documents 82 and 90 which are referenced in this opinion. This caution is not necessary if one does not direct the CMECF software program to show the headers.

FSD unbearable."

In 2005 Turner filed another complaint with Wisconsin against Lescroart complaining that she called him a bastard (Doc. 82, #10, ex 1(h)).

On June 15, 2004, Lescroart complained in a letter to the station manager that Island yelled at her after she requested him to leave the beltloader set up (Doc. 82, # 14, ex. 1(l)). She also complained in the same letter that "under no circumstances is he allowed to yell at or curse at me." She reminded the Sioux Falls station manager in the same letter that Island had previously "filed a harrassment (sic) complaint against me with corporate, of which I was cleared as there were no grounds."

On September 16, 2004, Lescroart complained again in a letter (Doc. 82, # 15, ex. 1(m)). She wrote about "inappropriate actions" toward her by Island and Turner. She mentioned "hostile work environment" without suggesting that she was the target because of her sex. Rather, she mentioned that she won't be initiating any more positive changes here "in any way, shape, or form . . . because of the undermining and sabotaging efforts of a few that continues to persist and dominate here at Sioux Falls." She mentioned that Island's complaint against her was an attempt to humiliate and intimidate her. There was no suggestion this was because she is female. She asserts "no one wants to be involved in any allegations presented against another employee, especially when they have seen first hand that these same agents have repeatedly harassed *other* agents without any successful intervention by fellow employees speaking up, union stewards or management." (Emphasis added). She continued by asserting in the letter that some ". . . agents continue to harass, humiliate and intimidate some of their *fellow* agents." (Emphasis added). It is significant she referred to *other* and *fellow* agents, not *female* agents. She added in the letter that she is "embarrassed . . . that we have new hires that start working here exposed to this sometimes hostile

6

work environment." Significantly, the reference is to new hires, not new *female* hires.

On September 27, 2004, Lescroart filed an internal complaint with Air Wisconsin (Doc. 82, #16, ex. 1(n)). Again she noted Island's complaint against her and noted that it was dismissed as frivolous. She mentioned that she has complained before about their behavior toward "me and *others*." (Emphasis added). Note the reference to others, not other females. She complained about their "abusive behavior." She did not complain that she or other females were targeted because of their sex.

Lescroart testified that most sexual references "don't offend me and I think are amusing." Lescroart can not identify any sexual references made to her by co-workers that offended her.

On November 3 & 4, 2004, Air Wisconsin's employee Missy Prohovic investigated the workplace behavior at Sioux Falls (Doc. 90, ex. 4). In her written report she listed the complaints:

> These alleged behaviors included purposely and blatantly flatulating, burping, and other despicable behaviors; making disparaging and intimidating comments based on gender and age; perpetuating an unsafe work environment; using profane language towards coworkers, and retaliating actions based on previously reported inappropriate behavior to the FSD Station Manager, Mr. Jim Halgren.

In the same paragraph she added that "Ms. Lescroart has also alleged that Mr. Chris Turner, Union steward and Mr. Barrry Homstrom (sic) PSA, have behaved in an intimidating and harassing manner towards her and other coworkers." Lescroart described the workplace to Missy Prohovic:

> An incident occurred sometime in late August when she and Mr. Island were the only two employees on the ramp. Ms. Lescroart asked Mr. Island to leave the belt loader hooked to plane. She said he replied by saying, "I don't have to fucking do what you say." Ms. Lescroart stated that these types of comments are made by Mr. Island on a daily basis. She explained that these comments are very upsetting to her and that she has asked him to stop many times, but it doesn't stop. Other examples provided by Ms. Lescroart were, "I don't have to listen to you fucking women" and" I've (meaning Lenn) worked in a prison before and I know people like you and you are psycho."

Lescroart continued by recounting the incidents listed above by Prohovic in her inventory of

7

complaints.

Island explained to Missy Prohovic that he and Lescroart had a falling out his first or second day of work when she called him the "NFG" (sic) and "their relationship has gone downhill ever since." (Doc. 90, ex. 4).

Missy Prohovic returned to Sioux Falls in December 2004 for follow up interviews. (Doc. 90, ex. 5). The interviews provide evidence that intimidating, ridiculing, and abusive comments were rooted mostly in antagonism and some in gender:

• Kim Schmidt indicated there was a verbally abusive atmosphere as a result of the behavior of Turner, Island, and Holmstrom. She had been called f___g bitch.

• Sarah Highstrom indicated Turner, Island, and Holmstrom used vulgar terms with her including f___g bitch, bitch squad, and f___g lazy ass. Turner flicked his tongue at her, made a kissing noise, and said "you know you want some of this." Highstrom responded by saying "no, I like them tall and skinny, not short and fat."

• Helen Heaton switched to the night shift because of the tension between Lescroart, Turner, and Island. She overheard Turner say "we don't need to hire any more g__ damn women." She described Turner and Island as two big bullies in the playground who have not yet grown up. She described a bullying incident involving Mr. Beadle and a screaming match between Lescroart and Turner. She heard Turner call Lescroart a f__g bitch. She commented that *employees* are not being treated with respect. (Emphasis added to distinguish from use of the term *female*).

• Barry Holmstrom blames Lescroart for the "trying atmosphere."

• Angie Ellison described the working atmosphere as tense. She said there is a conflict between Lescroart and Turner and Island. She saw Island shove a chair at Lescroart. Ellison perceives that Lescroart is harassing her as a result of the chair incident "because that is all Ms.

8

Lescroart talks about."

- Ashley Gallagher switched from full time to part time because work is so stressful. Holmstrom chews her out aggressively and she believes his behavior is mostly directed at women. She has been called bitch. A tug was driven too close to her. Vince Plucker in a room full of people made a vulgar and embarrassing comment to her following a trip to Denver that she made with a male employee. She described Turner as being very authoritative and Island as liking to tease everyone.

- Mary Yungeberg described the morning shift as tense. She perceived Turner as trying to undermine other employees. She observed him treat women poorly by screaming at them and throwing ear covers. She has seen Island and Turner slam doors, stomp their feet, and make "f_k you" comments. She described the working environment as a "junior high locker room because of all the gutter talk."

- Jim Halgren began his conversation with Prohovic by saying he "walked into a clash of personalities" at Sioux Falls. When he received Lescroart's first complaint he believed the issues could be easily resolved, but after he talked to Island and Lescroart together he became frustrated and told them they needed to act like adults and he "didn't care if they were both fired." Halgren later talked to Lescroart about the need to punch the clock in and out and about being tardy twenty two times. Lescroart explained that she was tardy because of the work environment.

- Vince Plucker overheard Island, Turner, and Holmstrom talking about the bad things they were doing to Lescroart so she would quit. He said there is joking around the workplace, but sometimes the joking is vindictive. He has heard Island call Lescroart a f___g bitch.

- Dan Beadle described Island as antagonistic. Beadle had trouble with Turner. He switched

shifts as a result of an incident with Turner.

The result of Prohovic's investigation was that Island was terminated on February 7, 2005, (Doc. 90, ex. 8) and on the same day Turner was given a five day disciplinary suspension (Doc. 90, ex. 9). Island's termination letter listed the reasons:

> The Company's investigation has established 1) that you have used the term "fucking bitch" to refer to co-workers on multiple occasions; 2) that you routinely use profanity in the workplace; 3) that you have engaged in intimidating behavior toward co-workers, such as yelling, throwing things, and slamming doors; 4) that you have engaged in crude and childish behavior during breaks; and 5) at least one coworker has observed you operating the tug recklessly on the ramp. Even during your own interview with Ms. Prohovic, you used profanity (telling Ms. Prohovic that you are not the "fucking new guy") and admitted that you deliberately farted while on duty the ramp and would continue to do so in the future.
>
> We have reviewed your employment history, and this is not the first time your workplace conduct has failed to meet Company standards. On more than one occasion, your station manager has verbally warned you that your immature conduct is unacceptable and that you are to conduct yourself in a professional manner while on duty. There is absolutely no evidence that you have made any attempt to correct your behavior.

Turner's five day suspension was explained:

> The Company had received complaints that you frequently used profanity toward co-workers while on duty, that you yell and intimidate co-workers, and that you have been reckless with equipment on the ramp.
>
> The Company's investigation has established 1) that you have used the term "fucking bitch" to refer to co-workers on multiple occasions; 2) that you routinely use profanity in the workplace; 3) that you engage intimidating behavior toward co-workers, such as yelling, throwing things, and slamming doors; and 4) that you have been observed driving a tug too fast and too close to your co-workers. As a result, you are being suspended without pay for five (5) days.

Turner was also advised there were complaints:

> 1) that you whistle at a female co-worker when she is in the airport on personal travel and you are on duty, and that, on one occasion, you grabbed her around the waist; and 2) that you made "kissing noises" and flicked your tongue at a female co-worker, saying to her "you know you want some of this." During your interview on December

8, 2004, you flatly denied any inappropriate behavior. Because no other witnesses were identified, the Company's investigation of these complaints is inconclusive. Nevertheless, I remind you that AWAC will not tolerate harassment or other discrimination based upon sex, race or other protected categories.

On May 5, 2005, Kim Swain, manager at Sioux Falls sent an e-mail to her training director saying something has to be done at the Sioux Falls station. "The situation is FSD is a big one. . . . The agents here HATE one another. There is so much conflict in this station and it has gotten out of control."

## DISCUSSION

### 1. Summary Judgment Standard.

"Summary judgment is proper if, after viewing the evidence in a light most favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Mere allegations not supported with specific facts are insufficient to establish a material issue of fact and will not withstand a summary judgment motion. Only admissible evidence may be used to defeat such a motion and affidavits must be based on personal knowledge. *Henthorn v. Capitol Communications, Inc.* 359 F.3d 1021, 1026 (8th Cir. 2004)(internal citations omitted).

### 2. Title VII Standards.

Title VII prohibits employment discrimination based on sex and covers a broad spectrum of disparate treatment. When the discrimination is not patent, a plaintiff may still prevail by showing that the inappropriate conduct creates a "hostile work environment." A prima facie case for a hostile work environment requires proof (1) that plaintiff is a member of a protected group; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition or privilege of her employment. The fourth element involves both objective and subjective components. The harassment must be "severe or pervasive enough to create an objectively hostile or abusive work environment" and the victim must subjectively believe that her working conditions

11

> have been altered. "There is no bright line between sexual harassment and merely unpleasant conduct ...." Accordingly, we view the "totality of the circumstances" in determining whether there is a hostile work environment. Some of the factors we look to include the frequency of the behavior, its severity, whether physical threats are involved, and whether the behavior interferes with plaintiff's performance on the job.

*Henthorn v. Capitol Communications, Inc.* 359 F.3d 1021, 1026 (8th Cir. 2004)(internal citations omitted).

There is a fifth element in a co-worker sexual harassment case. *Jenkins v. Winter*, 540 F.3d 742, 748 (8th Cir. 2008). It must be proven that "the employer knew or should have known of the harassment and failed to take prompt and effective remedial action." *Id.*

3. **Applying The Law To The Facts Of This Case.**

(a). **Element (1): Member of a Protected Class.**

Lescroart, a female, is a member of a protected class.

(b). **Element (2): Subjected To Unwelcome Sexual Harassment**

To establish a prima facie case Lescroart must demonstrate that she was subjected to unwelcome sexual harassment. "The term 'unwelcome' may be of such common usage that it need not be defined. . . . Conduct is unwelcome if the employee did not solicit or invite it and the employee regarded the conduct as undesirable or offensive." *Eighth Circuit Manual of Model Jury Instructions, Civil, 2005,*[3] Instruction 5.43, p. 155, note 4 citing *Moylan v. Maries County*, 792 F. 2d 746, 749 (8th Cir. 1986).

One definition of "sexual harassment" includes "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Eich v. Board of Regents for Cent. Missouri State;* 350 f.3d 752, 757, (8th Cir. 2003). Not only sexual advances, however,

---

[3]The online version is dated 2007. The cited quotation is found at p. 134 online.

constitute "sexual harassment." "Title VII provides employees the right to work in an environment free from discriminatory intimidation, ridicule, and insult. The *EEOC Guidelines* defining sexual harassment do not limit actions to only those actions that are directed at the plaintiff. . . . Other verbal or physical conduct of a sexual nature constitute sexual harassment when . . . such conduct has the purpose of effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Hocevar v. Purdue Frederick Co.,* 223 F.3d 721, 734 (8th Cir. 2000)(internal quotations and citations omitted, capitalization inserted).

There is consensus among those interviewed by Missy Prohovic that the workplace environment was tense. Some changed shifts as a result of conditions in the workplace. The workplace was dysfunctional enough to attract an internal investigation by Air Wisconsin. Kim Swain, the manager at Sioux Falls in May of 2005, wrote to her training director that something has to be done because the workplace is out of control because the agents hate one another. One person was fired as a result of workplace misconduct. Another received a five day suspension from work. The workplace environment was permeated with unwelcome conduct. Lescroart herself used the words "shit, f___, damn" and "FNG" with her co-workers and cursed at her co-workers.

The unwelcome conduct at Air Wisconsin in Sioux Falls cannot be categorized as sexual advances or requests for sexual favors. The conduct was antagonistic in nature. To qualify as unwelcome sexual harassment, therefore, the antagonistic conduct must be *discriminatory* intimidation, ridicule, or insult. Unquestionably the conduct as a whole was intimidating, ridiculing, and insulting. The conduct, however, was not discriminatory because it was not directed only at females. The conduct was not based on an interest in sexual favors or sexual matters nor did it target females because of their sex. The conduct, though unwelcome, was not sexual harassment.

13

### (c). Element (3): Harassment Based On Sex.

To establish a prima facie hostile work environment claim for co-worker harassment under Title VII, an employee must prove regarding this element "a causal nexus between the harassment and her membership in the protected group."*Jenkins v. Winter,* 540 F.3d 742, 748 (8th Cir. 2008). Even if the offending behavior was abusive, Lescroart must "prove that she was the target of harassment because of her sex and that the offensive behavior was not merely non-actionable, vulgar behavior." *Hervey v. County of Koochiching,* 527 f.3d 711, 722 (8th Cir. 2008)(internal citiation omitted).

There is scattered evidence that workplace comments were based on sex. There were references to females as f__g bitches and the bitch squad. There were comments about not needing any more women around here. Turner flicked his tongue at Highstrom and made a kissing noise, and said "you know you want some of this." Highstrom responded by saying "no, I like them tall and skinny, not short and fat." Vince Plucker in a room full of people made a vulgar and embarrassing comment to Gallagher following a trip to Denver that she made with a male employee. Lescroart was called the cleaning lady. The word "sooey"was used (a word farmers use to call pigs) while making weird noises. Vince Plucker overheard Island, Turner, and Holmstrom talking about the bad things they were doing to Lescroart so she would quit. Turner treated women poorly by screaming at them and throwing ear covers.

The number of sex based facts are far fewer than those which are sex neutral or are rooted in antagonism. Turner and Island disliked Lescroart and she disliked them. She transferred into Sioux Falls and displaced Turner from the top seniority spot. As a result she became operations manager, not Turner. At the same time Turner was the union steward at Sioux Falls, the same union

14

to which Lescroart belonged. Virtually all who were interviewed by Missy Prohovic described the workplace as tense, verbally abusive, a trying atmosphere, or a "junior high locker room because of all the gutter talk." Turner and Island were described as playground bullies. Profanity was common among employees of both genders. The joking sometimes became vindictive. Doors were slammed. Feet were stomped. People screamed at each other. An angry male shoved a chair toward a female. Gas was passed. Belching occurred. A nose was crassly picked. Turner tried to undermine other employees. Employees of both genders changed shifts as a result of the work environment. A manager who described the workplace as a clash of personalities told Lescroart and Island to start acting like adults. A successor manager described the workplace as one where the agents "HATED" one another. The listing of reasons for Island's termination did not specify that the offending conduct targeted females. The listing of reasons for Turner's five day suspension did not specify that the offending conduct targeted females.

    Lescroart's own complaints were of an intimidating, humiliating, and hostile workplace to "fellow agents," to "me and others," and to "new hires." Lescroart's own complaints did not specify conduct which was directed only at females.. Lescroart testified that most sexual references "don't offend me and I think are amusing." Lescroart cannot identify any sexual references made to her by co-workers that offended her. Lescroart herself used the words "shit, f___, damn" and "FNG" with her co-workers and otherwise cursed at her co-workers. She acknowledged that her own cursing "was inappropriate for the workplace." Lescroart acknowledged that almost all of her co-workers, including the females, cursed and acted inappropriately at work.

    On April 17, 2002, Lescroart received a performance review by her female supervisor, Ingie Richter, indicating among other things, that she had difficulty working with others. Several female

15

employees believed that Lescroart was very bossy, arrogant, provocative and not easy to work with. Lescroart had problems working with Kandis Moore (female), Chris Turner (male), Lenn Island (male), Jennifer Dyke (female), and Barry Holmstrom (male).

It is true there was bullying conduct, vulgar language, and disgraceful treatment of fellow workers. Regrettably, both genders participated and both genders were victims of the same type of conduct. Regrettably the conduct was hostile, vindictive, and antagonistic. The workplace conduct, however, was not the product of gender discrimination because members of one sex were not exposed to disadvantageous terms or conditions of employment to which members of the other sex were not exposed. *Oncale v Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998). It is also established, despite the scattered evidence of sex based comments, that the cause of the offending behavior was antagonism among and between the parties. Lescroart has not demonstrated that she was the target of harassment because of her sex. *Hervey* at 722.

### (d). Element (4): That The Harassment Affected A Term, Condition Or Privilege Of Her Employment.

It is accepted as true, both objectively and subjectively, that the workplace behavior affected a term, condition, or privilege of Lescroart's employment. The workplace behavior was not discriminatory, although intimidating, ridiculing, and abusive. Title VII applies only to discriminatory behavior. It has been determined in this opinion that the cause of the offending conduct was antagonism among and between the parties, and that Lescroart personally was not, and females generally were not, targeted because of their sex. Both sexes participated in the same kind of conduct. Both sexes were victims of the same kind of conduct. Neither sex was exposed to disadvantageous terms or conditions of employment to which members of the other sex were not. *Oncale* at 80.

(e).   **Element(5): That The Employer Knew Or Should Have Known Of The Harassment And Failed To Take Prompt And Effective Remedial Action.**

It is not necessary to address this issue.

## CONCLUSION

The EEOC has not demonstrated that it can prove a prima facie case. As a matter of law the offending behavior was not based on Caroline Lescroart's sex nor did the offending behavior target females. Rather, the offending behavior was the result of antagonism among and between employees. Title VII does not address the type of behavior involved in this litigation.

It is ORDERED that the motion for summary judgment (Doc. 78) is GRANTED. All other pending motions (Docs. 50, 69, 97, and 101) are DENIED AS MOOT.

Dated this 6 day of November, 2008.

BY THE COURT:

John E. Simko
United States Magistrate Judge

17